# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **KAON-JABBAR EAST EL**, | Case No. 3:19-cv-333-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **UNITED PARCEL SERVICE, INC.**, | |
| Defendant. | |

Kaon-Jabbar East El. Plaintiff *pro se*.

Elizabeth A. Falcone and Carlie E. Bacon, OGLETREE, DEAKINS, NASH, SMOAK & STEWART PC, 222 SW Columbia Street, Suite 1500, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Kaon-Jabbar East El, now representing himself, brings this action against his former employer, Defendant United Parcel Service, Inc. ("UPS"). Mr. El worked for UPS from November 19, 2016 through January 15, 2017. Mr. El asserts four claims, alleging: (1) religious discrimination, in violation of Or. Rev. Stat. ("ORS") § 659A.030; (2) race discrimination, in violation of ORS § 659A.030; (3) whistleblower retaliation, in violation of ORS § 659A.199; and (4) common law constructive termination. UPS has moved for summary judgment. For the reasons explained below, the Court grants UPS's motion.

**STANDARDS**

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252,

255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

**BACKGROUND[1]**

**A. Mr. El's Job Application with UPS**

Mr. El filled out an online application for the position of seasonal Driver Helper at UPS

on November 17, 2016. This online application includes a "voluntary self-disclosure" section

asking applicants to state their race but allowed applicants the option of checking a box stating,

"choose not to voluntarily self-disclose." ECF 31, Ex. 2 at 9. The application also included a race

disclosure field in the "personal information" section. Mr. El alleges that he declined to answer

---

[1] At this stage of the litigation, the Court views the evidence in the light most favorable to
Mr. El. *See Clicks Billiards*, 251 F.3d at 1257.

PAGE 2 – OPINION AND ORDER

both questions that asked for his racial identification and left them blank. He further alleges that neither question that he saw gave applicants the option to select "Other" as their race or "choose not to voluntarily self-disclose" their race. Mr. El states that he declined to answer these questions because he is a member of the Moorish Science Temple of America and that classifying himself by race would conflict with his religious beliefs.

Mr. El interviewed at UPS on November 19 and received an offer to work as a seasonal Driver Helper. Mr. El's interviewer did not mention the application sections that Mr. El left blank, but Mr. El acknowledges she may have told him that there was additional paperwork he would have to fill out. At the interview, Mr. El met Karl Zabel, who would be his supervisor at UPS.

Mr. El attended new employee orientation on November 26. During the orientation, Lori Atkinson, a UPS Human Resources ("HR") employee, approached Mr. El and informed him that his application was incomplete. Ms. Atkinson told him that UPS could not hire him until he completed the race classification part of the application. It is unclear whether she was referring to the "voluntary self-disclosure" section or the "personal information" section of the application. The available options stated on the printed form were "Hispanic," "White," "Black," "Asian American/Pacific Islander," "Hawaiian or Other Pacific Islander," "American Indian/Alaskan Native," and "Two or More Races." The printed form did not include an option for "Other." Mr. El told Ms. Atkinson that the race classification question was voluntary and that classifying himself as a particular race conflicted with his religion. Ms. Atkinson informed Mr. El that UPS would not be able to pay Mr. El unless he answered out the race disclosure question. Mr. El repeated that choosing any of the listed options would "vehemently conflict with [his] religion which teaches that [his] race is human." ECF 35, Ex. 1 at 82. He asked Ms. Atkinson if he had to

"compromise how [he] religiously identifies and racially identifies to get paid?" *Id.* at 83.

Ms. Atkinson told Mr. El that she understood his point but that "the feds" required UPS to

collect employee race information. *Id.* Ultimately, under protest, Mr. El selected "White."

Toward the end of the meeting, Mr. El told Ms. Atkinson that the situation upset him and

that he would return with his religious documentation. Mr. El also requested that UPS create a

racial option for "Other." Mr. El met with Ms. Atkinson again on December 9, 2016. They

discussed his issue with the race identification question. Mr. El repeated his objections and asked

that UPS change his race to "Human" on the form. Ms. Atkinson told Mr. El that there was

nothing she could do. Mr. El obtained contact information for one of Ms. Atkinson's superiors in

HR, Dominique Johnson, from the receptionist on his way out.

Mr. El spoke with Ms. Johnson and Mr. Dennis Ewing of UPS by telephone

approximately three times. Mr. El reiterated that being required to self-identify by race conflicted

with his religious beliefs. Mr. El later met with Mr. Ewing in person. Ms. Johnson brought into

the meeting. Mr. El again asked that UPS provide him with the option of listing "Human" or

"Other" and that UPS correct Mr. El's race classification in its records. Ms. Johnson and

Mr. Ewing responded that they could not help Mr. El because UPS was required by federal law

to collect racial identification data for its employees.

**B.  Mr. El's Tenure at UPS**

Despite these issues, Mr. El began work as a Driver Helper at UPS. Driver Helpers are

seasonal employees who assist UPS drivers during Peak Season usually, from November to

January. After Peak Season ends, UPS terminates the employment of the Driver Helpers. UPS

hires more Driver Helpers than it needs, so the position is "on-call." Driver Helpers confirm their

availability every morning with the Driver Helper Coordinator, who may then assign them to

assist a UPS Driver if help is needed. Driver Helpers who confirm their availability may collect availability bonuses even if they are not ultimately assigned to assist a UPS driver.

Karl Zabel was Mr. El's Driver Helper Coordinator. Mr. Zabel sent Mr. El an email each morning from December 9 onwards to inquire about Mr. El's availability. Mr. El told Mr. Zabel by telephone each morning when he was available to work. Mr. El spoke with Mr. Zabel by telephone on December 12 to check in and to inform him that he would be unavailable to work from December 15 through December 19 because of a death in his family. Mr. El also requested, by email on December 15, that Mr. Zabel discontinue sending Mr. El daily emails until December 20. Mr. El suffered another death in his family on December 18 and left Mr. Zabel a voicemail on December 19 informing Mr. Zabel that he would be returning on December 21. Mr. Zabel missed that voicemail and called Mr. El on the morning of December 20 to ask about Mr. El's availability. Mr. El did not respond immediately but later that morning sent an email to Mr. Zabel explaining that he would not be returning until the next day.

Mr. El returned on the morning of December 21 and sent an email to Mr. Zabel informing him know that he was available for work. Mr. El also was available for work on December 22 and December 23 but was not assigned to assist a UPS driver either day. Mr. El received his availability bonus on December 23 and discussed with Mr. Zabel the "issues" that he was having with the HR department at UPS. On December 27, Mr. Zabel sent a group email to all UPS Driver Helpers whom Mr. Zabel was coordinating, asking if any would be interested in a permanent position at the UPS Portland hub. Mr. El replied, expressing interest in a permanent position and also asking whether any Driver Helper shifts were available that day. Mr. Zabel informed Mr. El that no Driver Helper shifts were available that day, and Mr. Zabel promised to follow up with more information on the permanent position.

Mr. Zabel sent an email to all Driver Helpers in early January asking about availability for possible additional shifts but ultimately did not assign any shifts to any of the Driver Helpers. UPS terminated the employment of all Driver Helpers, including Mr. El, on January 15. Mr. Zabel followed up with Mr. El on January 31 about the permanent position at the Portland UPS hub. Mr. El informed Mr. Zabel that he was no longer interested in the permanent position because he was working again as a substitute teacher.

## DISCUSSION

### A. Religious and Racial Discrimination

ORS § 659A.030 provides that it is an unlawful employment action for an employer to discriminate against an individual in the terms and conditions of employment because of a person's race or religion, among other things. ORS § 659A.030(1)(a). Claims brought under this statute are analyzed under the same framework as claims brought under Title VII—by applying the *McDonnell-Douglas* burden shifting framework. *See Dawson v. Entek Int'l*, 630 F.3d 928, 934 (9th Cir. 2011); *Henderson v. Jantzen, Inc.*, 79 Or. App. 654, 657 (1986).

Under that framework, first, the employee or former employee must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employee successfully does that, the employer must then articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* If the employer satisfies this burden, the employee must then show evidence that the employer's stated reason is pretextual. *Id.* at 804. "A plaintiff alleging employment discrimination need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir.2008) (quotation marks omitted).

A plaintiff establishes a prima facie case of discrimination by showing that: (1) he or she belongs to a protected class; (2) he or she was qualified for his or her position or was performing according to his or her employer's legitimate expectations; (3) he or she suffered an adverse employment action; and (4) similarly situated individuals outside the protected class were treated more favorably. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998). "The requisite degree of proof necessary to establish a prima facie case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence." *Davis*, 520 F.3d at 1089 (quotation marks omitted).

Here, the Court need not proceed to the second or third steps of the *McDonnell Douglas* framework because Mr. El has not established a prima facie case of discrimination. Mr. El's prima facie case of discrimination fails because he has not shown that UPS treated differently any other similarly situated individuals outside the protected class. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (noting that "[a] person suffers disparate treatment in his employment when he or she is singled out and treated less favorably than others similarly situated on account of race [or religion].").

Mr. El alleges two adverse employment actions: (1) forcing him to choose a race under protest, rather than using an observer to identify his race; and (2) not assigning him shifts as a Driver Helper when he was available. Even if these decisions constitute adverse employment actions, there is no evidence that UPS treated other Driver Helpers of different races or different religions differently in either of these two ways.

Mr. El does not allege that UPS permitted other Driver Helper applicants (of other races or religions) to leave the race disclosure field blank or that UPS used an observer to identify the race of any applicant who left the field blank. There also is no evidence that Driver Helpers of

other races or religions received shifts on days that Mr. El did not. At his deposition, Mr. El

admitted that he had no facts showing that UPS's "decision on whether or not to assign [him] to

a shift as a driver helper was influenced in any way" by Mr. El's race or religious beliefs.

ECF 27, Ex. 1 at 113-14. At oral argument, Mr. El confirmed that he had no evidence that UPS

treated other Driver Helpers differently from him. UPS's actual shift assignment practices do not

show disparate treatment. During Peak Season 2016, UPS hired at least 17 other Driver Helpers

who did not work any shifts. ECF 28 ¶ 3.

      The evidence shows only that UPS treated Mr. El the same way that it treated other

Driver Helpers whom Mr. Zabel supervised. Mr. Zabel included Mr. El in all group emails that

he sent to the Driver Helpers in December. On December 23, Mr. Zabel informed all the UPS

Driver Helpers under his supervision—including Mr. El—that they were not assigned to a car

that day. ECF 27, Ex. 7. Similarly, Mr. Zabel sent an email to all Driver Helpers in early January

that he might have work for them but the next day sent all of them an email explaining that none

would be assigned to shifts because "package volume did not materialize today as planned due to

weather conditions." ECF 27, Ex. 10. The record does not show that UPS singled out Mr. El to

deprive him of shifts "on account of race [or religion]." *Cornwell*, 439 F.3d at 1028 Thus, Mr. El

has failed to establish a prima facie case of disparate treatment and he cannot maintain claims for

either racial or religious discrimination in violation of ORS § 659A.030.

## B.  Whistleblowing Retaliation

      ORS § 659A.199 provides that an employer may not "retaliate against an employee . . .

for the reason that the employee has in good faith reported information that the employee

believes is evidence of a violation of a state or federal law, rule or regulation." ORS § 659A.199.

To establish a prima facie case under this statute, "a plaintiff must show three elements: (1) [he

or she] engaged in a protected activity, (2) [he or she] suffered an adverse employment action,

and (3) there is a causal link between the protected activity and the adverse action." *Lynch v.*
*Klamath Cnty. Sch. Dist.*, 2015 WL 2239226, at *4 (D. Or. May 12, 2015). Mr. El has not
established a prima facie case of retaliation because he provides no evidence of a "causal link
between the protected activity and the adverse action." *Id.*

    For the purposes of the pending motion, UPS does not dispute (1) that Mr. El's
complaints about race disclosure constitute protected activity and (2) that failure to assign Mr. El
a shift on December 22, 2016 constitutes an adverse employment action. UPS maintains,
however, that Mr. El fails to raise a genuine issue of material fact as to the causation element.
"At the prima facie stage of a retaliation case, the causal link element is construed broadly so that
a plaintiff merely has to prove that the protected activity and the negative . . . action are not
completely unrelated." *Syrop v. Whole Foods Mkt. of the Pac. Nw.*, 2015 WL 7180488, at *2
(quoting *Poland v. Chertoff*, 494 F.3d 1174, 1180 n. 2 (9th Cir.2007)). This Court has interpreted
the causation requirement to mean that the employee's protected activity "must have been a
factor that made a difference . . . in the decision." *Tornabene v. Nw. Permanente, P.C.*, 156 F.
Supp. 3d 1234, 1246 (D. Or. 2015) (citation and quotation marks omitted).

    UPS argues that Mr. El has provided no evidence that Mr. Zabel, the supervisor
responsible for assigning Mr. El shifts knew before December 23 that Mr. El had complained
about UPS's employment forms. At his deposition, Mr. El admitted that he had no facts that
Mr. Zabel's "decision on whether or not to assign [him] to a shift as a Driver Helper was
influenced in any way" by Mr. El's "concerns about the voluntary disclosure form on the UPS
hiring documents." ECF 27, Ex. 1 at 114. At oral argument, Mr. El acknowledged that he had no
facts to show that Mr. Zabel knew about his classification dispute with UPS before
December 23. Mr. El's classification dispute, therefore, could not have "been a factor that made

a difference" in Mr. Zabel's shift assignment decisions because there is no evidence that Mr. Zabel even knew about the dispute until the day after the alleged adverse employment action. *See Tornabene*, 156 F. Supp. 3d at 1246 .[2]

## C. Constructive Discharge

To establish a claim under the theory of constructive discharge, a plaintiff must show:

> (1) the employer intentionally created or intentionally maintained specified working condition(s); (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions.

*McGanty v. Staudenraus*, 321 Or. 532, 557 (1995). Mr. El argues that UPS created intolerable working conditions by forcing him to identify his race on the application form (which caused him psychological distress) and by offering him shifts only when UPS knew he was unavailable. Even if these might constitute intolerable working conditions, Mr. El has not established that he left "the employment as the result of those working conditions." *McGanty*, 321 Or. at 557. Mr. El admits that he "avoided thinking of resigning before the end of Peak Season." ECF 31 at 16. Mr. El also does not dispute that UPS terminated his employment at the end of Peak Season, along with that of all other seasonal Driver Helpers. *See* ECF 31, Ex. 4 at 223. Further, Mr. El did not resign, so it is impossible that any of UPS's conduct induced him to resign.

---

[2] Mr. El argues that there is a "possibility" that Mr. Zabel communicated with HR and learned about the classification dispute before December 22nd. A possibility, however, is not enough to survive summary judgment. *See Tornabene*, 156 F. Supp. 3d at 1246 (noting that the burden is on the plaintiff to establish causation at the summary judgment stage); Fed. R. Civ. P. 56 (explaining that a party must support its assertions with record evidence and outlining the steps a nonmovant should take if they cannot present facts essential to justify their opposition to a summary judgment motion).

## CONCLUSION

UPS's motion for summary judgment (ECF 26) is GRANTED.

**IT IS SO ORDERED**.

DATED this 22nd day of May, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge